Cite as 2019 Ark. App. 404

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV-19-329

| | |
|---|---|
| CHAD CASTLEBERRY | **Opinion Delivered:** September 25, 2019 |
| APPELLANT | |
| | APPEAL FROM THE WASHINGTON |
| V. | COUNTY CIRCUIT COURT |
| | [NO. 72JV-17-557] |
| ARKANSAS DEPARTMENT OF | |
| HUMAN SERVICES AND MINOR | |
| CHILD | HONORABLE STACEY |
| | ZIMMERMAN, JUDGE |
| APPELLEES | |
| | AFFIRMED |

**BART F. VIRDEN, Judge**

This is an appeal from the Washington County Circuit Court's order terminating Chad Castleberry's parental rights to A.C. (born 07/19/17). On appeal, Castleberry asserts that the circuit court failed to make the required findings under the Indian Child Welfare Act ("ICWA") in the termination order. Castleberry also argues that the evidence was insufficient to support the circuit court's decision that serious physical and emotional harm would likely result if A.C. is returned to Castleberry's custody. We affirm.

I. *Relevant Facts*

On July 24, 2017, the Arkansas Department of Human Services ("Department") filed a petition for emergency custody and dependency-neglect regarding A.C. In the affidavit attached to the petition, the Department alleged that A.C.'s safety and well-being were in danger because the mother, Destiny Fletcher, was a flight risk and had a history of drug abuse. Castleberry was incarcerated at the time. The Department identified this case as one

involving the ICWA. The Department noted that it had been involved with the family since 2012 due to inadequate supervision, parental drug use, inadequate food and clothing, and environmental neglect. Fletcher's and Castleberry's parental rights had been terminated as to four older children, there was an open dependency-neglect case for two children, R.C.1 and R.C.2 (both born 08/13/16), and the parents were noncompliant with the case plan.

The court entered an ex parte order for emergency custody finding that it was in A.C.'s best interest to remove her from Fletcher's custody. The parents were ordered to cooperate with the Department, attend the meetings and staffings, provide the Department with all contact information, remain sober, submit to drug screening, attend counseling, obtain stable housing and employment, demonstrate the ability to protect A.C., maintain contact with their attorneys, follow all court orders and the case plan, and resolve all criminal matters. The Department was ordered to provide referrals and services. Notice of a custody hearing was provided to the Cherokee Nation of Oklahoma.

On September 8, 2017, the court entered an adjudication order finding that neither parent had complied with the case plan and that both parents were incarcerated at the time of the order. Castleberry explained that he was incarcerated on charges of delivery of methamphetamine, possession of methamphetamine with intent to deliver, and possession of drug paraphernalia and that he would be released on March 5, 2018. The court found that clear and convincing evidence supported the determination that

> the Department made active efforts to provide remedial and rehabilitative services designed to prevent the break-up of the Indian family or that an emergency precluded those efforts and that continued custody with the parents is likely to result

2

in serious emotional or physical damage to the juvenile. The Court finds that [A.C.] is in an ICWA-compliant placement—a tribal foster home.

The circuit court entered the permanency-planning order on January 12, 2018, finding that return to the custody of either parent was contrary to A.C.'s health, safety, and welfare and that returning the juvenile to the custody of a parent would likely result in serious physical or emotional harm to the juvenile. The court found that Castleberry had not complied with the case plan or orders of the court, specifically, that he had not participated in any services offered by the Department or the Arkansas Department of Correction, and he had not contacted the Department during the case. The court found that the Cherokee Nation had been working with the parents for several years to remedy their drug use and criminality to no avail.

On March 20, 2018, the Department filed a petition to terminate the parents' rights asserting that (1) the juvenile or a sibling has been found dependent-neglected as a result of neglect or abuse that could endanger the child's life; (2) other factors arose subsequent to the filing of the petition for dependency-neglect and the parents have manifested the incapacity or indifference to remedy those factors; (3) Castleberry had been sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile's life; (4) the parents subjected A.C. to aggravated circumstances in that there is little likelihood that services will result in successful reunification; and (5) the parents have had their rights involuntarily terminated as to multiple siblings of A.C.

On June 8, 2018, the circuit court entered a review order finding that A.C. could not be safely returned to her parents' custody. The circuit court found that Fletcher had complied with most of the court orders and case plan and had made substantial progress

3

toward reunification. As to Castleberry, the circuit court found that he had complied with some of the court orders and had made some progress toward reunification. The same day, the circuit court granted a voluntary dismissal of the Department's petition to terminate parental rights. On June 29, the court entered an agreed order to begin a trial home placement with Fletcher, and Castleberry was allowed to have visitation three times a week.

On September 5, the court ordered the Department to drug screen Fletcher because she had been arrested on methamphetamine-related charges. The circuit court entered the permanency-planning order on September 6, 2018, finding that the trial home placement was terminated because of Fletcher's arrest. The court found that Castleberry had not attended NA/AA meetings, completed a drug-and-alcohol assessment, or demonstrated the ability to protect A.C. and keep her safe from harm. The court noted that in the spring Castleberry had relapsed before entering counseling.

The Department filed a second petition for termination, asserting the same grounds as in the first petition and including the recent events set forth in the permanency-planning order.

On January 2, 2019, the circuit court held a termination hearing. At the hearing, Nicole Allison, the Cherokee Nation ICWA specialist, testified that she had been involved with the family since the couple's first child, A.F., was brought into the Department's custody. She opined that there is evidence beyond a reasonable doubt that continued custody by either parent would result in serious emotional or physical damage to A.C. Allison testified that the foster family who had already adopted siblings B.C., R.C.1, and

4

R.C.2 were willing to adopt A.C. as well. Allison also testified that she was very concerned about Castleberry's arrest with Fletcher, and she explained that

> the past history has been they're broke up, they're separated, they're not together, and then we got the first twins, K.C.1 and K.C.2 'cause of domestic violence, yet again, between mom and dad. And that's where the violence concerns come from. And the kids were removed. Then they were apart again. Then B.C. was born. They were apart again, they weren't supposed to be together, he was in jail, mom gets re-arrested. The twins that we just had were brought into custody. Mom's in jail for drugs. Dad's in jail for drugs. And mom's pregnant with A.C. who is Mr. Castleberry's. They continue to be married today. And they're together, they're apart, they're together, they're apart. And they'll do well for four to six months. They did well for R.C.1 and R.C.2 for four to six months, and then mom fell off the bandwagon. I showed up at dad's house. He said they're separated. She's got a warrant for her arrest. Then two months later he's in trouble again with mom with drugs. It just seems to be a pattern is these two get back together. He's had terroristic threatening against him. They get together, and they bring out the worst in each other. They end up back in drugs, domestic violence. They say they weren't together. They said that he wasn't a part of it. But dad has a long history of drugs. He knows mom. He knows when she's high, knows she's just been getting into trouble and testing positive, and yet he gave her a ride. He put himself in that position. How much more do we put these kids through? A.C. was in the home for a while, and then we placed her with mom and then within three months, she had to be picked back up from mom.

Eugenia Marks, the family's caseworker, testified that A.C. was doing well in her ICWA–compliant placement and that A.C. is highly adoptable. Marks testified that Castleberry had maintained weekly contact with the Department, kept them informed of his contact information, attended counseling, attended visitation and was very bonded to A.C., submitted to drug screening, completed parenting classes (though he had not produced the certificate), maintained stable housing and employment, and completed the psychological evaluation. Castleberry had not provided proof of attendance at NA/AA meetings, and he had been arrested two weeks earlier on charges of delivery of methamphetamine and for a probation violation.

Castleberry explained that the delivery-of-methamphetamine charge against him would be dropped because Fletcher signed an affidavit stating that the drugs and paraphernalia in the car were hers and that he was simply giving her a ride to the grocery store. Castleberry testified that he had completed his drug-and-alcohol assessment and that he had been attending NA/AA meetings and that he had proof of both in his truck, which he was allowed to retrieve. He explained that he had passed his drug screens and that he had not submitted the non-court-ordered drug screen because he was told he was not required to. Castleberry testified that he had gone to Wyoming for work but that he had believed Fletcher was going to regain custody. When Castleberry discovered that Fletcher was in trouble and he needed to "step it up," he came back. As for their arrest on December 19, he claimed he did not know Fletcher had a "drug issue" and that no drugs had been seized from his vehicle or him. He testified that he believed that Fletcher's rights should be terminated but that he could provide a safe home for A.C. Castleberry admitted that he and Fletcher were still married, that he knew Fletcher had been arrested in September for methamphetamine-related charges, and that he still gave her a ride knowing she is a felon and that doing so is a violation of his probation. Castleberry testified that he would cut all ties with Fletcher.

The court stated that Castleberry believed that Fletcher would regain custody of A.C. when he left for work in Wyoming and that he made the choice to leave the state. The court also found that Castleberry, who was on probation and knew that he was not allowed to be in the company of a felon, gave Fletcher a ride to the grocery store. The court explained that Castleberry chose not to distance himself from Fletcher and that he made the

6

bad decision to remain in contact with her, which was a recurring issue. The court found that Castleberry and Fletcher were still married, which was further evidence that he was not "shed of her."

The circuit court entered the order terminating Fletcher's and Castleberry's parental rights on January 30, 2019. A supplemental termination order was filed a week later to correct erroneous dates in the first order. In the order, the circuit court found the following:

> The granting of the Petition to Terminate Parental Rights of the mother and father is based on clear and convincing evidence, and beyond a reasonable doubt, that it is in the juvenile's best interest, including consideration of the following factors: the likelihood that the juvenile will be adopted if the petition to terminate parental rights is granted, specifically the testimony of Eugenia Marks, DHS caseworker and Nicole Allison, Cherokee Nation Indian Child Welfare specialist, who each testified that the present foster parents wish to adopt [A.C.]; and the potential harm, specifically addressing the effect of the health and safety of the juvenile, caused by continuing contact with the parent and the likelihood that returning the juvenile to the custody of the parents would likely result in serious physical or emotional damage to the juvenile; and clear and convincing evidence, and beyond a reasonable doubt of the following grounds alleged in the petition[.]

The court found three grounds supporting termination: (1) that A.C. had been out of the custody of the parents for twelve months, and despite meaningful effort by the Department to rehabilitate the parents and correct the conditions that cause removal, those conditions had not been remedied; (2) "other factors" had arisen subsequent to the filing of the petition that despite appropriate family services, demonstrate that the child cannot be safely returned to the parents' custody; and (3) the parents' rights to six other siblings of A.C. had previously been involuntarily terminated. The court also found that Castleberry had not demonstrated the ability to keep A.C. safe given his continued relationship with Fletcher, who had relapsed. Castleberry timely filed a notice of appeal.

## II. *Discussion*

The standard of review in appeals of termination of parental rights is de novo, but we reverse a circuit court's decision to terminate parental rights only when it is clearly erroneous. *Mitchell v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 715, 430 S.W.3d 851. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a distinct and firm conviction that a mistake was made. *Wade v. Ark. Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999).

Castleberry's first argument on appeal is that the circuit court's order does not comply with the ICWA standard that

> [n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C.A. § 1912 (Westlaw current through P.L. 116–56).

Castleberry asserts that the termination order stating that the circuit court "considered" adoptability and the potential for serious physical or emotional damage is inadequate and does not constitute a "determination" as required by the ICWA. Castleberry acknowledges that the circuit court made an ICWA-compliant oral ruling from the bench that it was in A.C.'s best interest to terminate parental rights; however, he asserts that the written order controls and that it is inadequate because the court only "considered" that serious physical or emotional harm was likely to result if A.C. was returned to Castleberry's custody. We disagree.

8

Castleberry does not cite any authority to support his argument that the court's written order does not comply with the ICWA. When a party cites no authority or convincing argument on an issue, and the result is not apparent without further research, the appellate court will not address the issue. *Arazola v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 109, at 14, 573 S.W.3d 35, 42. Moreover, there is no requirement that the court use the word "determine" for the order to be a valid determination of the court. Judgments are construed like any other instrument; the determinative factor is the intention of the court, as gathered from the judgment itself and the record. *Allen v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 608 at 7, 377 S.W.3d 491, 496. Judgments should be reviewed by looking to the judgment itself, the pleadings, and any evidence presented. *Id.* In interpreting a lower court's order, we look to the language in which the order is couched and whether the evidence supports the ruling. Here, the order sets forth the best-interest finding that "[t]he granting of the petition to terminate parental rights of the mother and father is based on clear and convincing evidence, and beyond a reasonable doubt that it is in the juvenile's best interest[.]" Having reviewed the language of the judgment, we hold that the circuit court made a determination regarding the potential for harm to A.C., and we affirm.

Castleberry also asserts that the circuit court's best-interest determination that returning A.C. to his custody would likely result in serious emotional or physical damage to her is not supported by the evidence. As stated above, in cases governed by the ICWA, the court's decision that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child must be supported by evidence beyond a reasonable doubt—a more stringent standard than the one imposed by

9

the Arkansas Code. *Elliott v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 672, at 4–5, 536 S.W.3d 642, 645.

The court found that Castleberry had not shown that he was able to provide a safe and stable home for A.C. because of his ongoing relationship with Fletcher. A court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Harbin v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 715, at 3, 451 S.W.3d 231, 233. Castleberry's decision to put Fletcher's needs above A.C.'s by giving Fletcher a ride to the grocery store knowing that she was using drugs again and that she is a felon weighed heavily with the circuit court. Fletcher's possession of drugs in the car Castleberry was driving caused both parents to be arrested on December 19, just a month before the termination hearing. Castleberry violated probation by associating with Fletcher, and the court found that "father cannot demonstrate the ability to keep [A.C.] safe, as he continues to be in an unhealthy and unstable relationship with the mother, despite knowing she is using illegal drugs and is going downhill." The ICWA specialist testified that since 2012, the parents had established a pattern of getting clean for a few months, relapsing, having the children taken away, Fletcher becoming pregnant, the family getting involved with the Department, and the parents getting clean for a few months again only to start the cycle over. She explained that this latest cycle was a continuation of what had happened four previous times with the couple's six older children. Given the evidence and testimony, we find no error in the circuit court's determination and affirm.

Affirmed.

SWITZER and VAUGHT, JJ., agree.

10

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Ellen K. Howard*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.